May it please the Court, my name is Cindy Cohen and I represent the plaintiffs in the 33 collected MDL cases. The District Court struggled with Section 802, calling it sui generis, and I'd like to discuss how this statute oversteps three constitutional barriers. Article 1, Section 7, the non-delegation doctrine, and due process. While each of these alone would be sufficient to have the statute declared unconstitutional, taken together I think it demonstrates just how clearly Section 802 bypasses our constitutional system of checks and balances. And the result is that the executive is allowed to effectively grant civil pardons to select telecommunications carriers for facilitating the massive dragnet surveillance of their own customers. First, in an argument that the District Court failed to address, Section 802 violates Article 1, Section 7 of the Constitution because, as in the Clinton case, in Section 802 Congress told the Attorney General, on the one hand, here are all these statutes that we've passed that make electronic surveillance legal and illegal and create a cause of action. And on the other hand, here's a new law that mandates dismissal. You choose which statute to apply in each case. And the contrast is clear if you compare how 802 works with the statutes in Robertson and Alito. Those are cases where also causes of action were dismissed, pending cases were dismissed, but in each of those Congress made the decision to change the laws applicable to the cases. And second, Section 802 violates the non-delegation doctrine. As the District Court did find, this statute merely provides that if the Attorney General certifies, then the cases are dismissed. And it gives no guidance whatsoever for when the Attorney General should certify. And third, Section 802 violates due process, stacking the deck in the court in two key ways. First, due process requires that an adjudication de novo. But the statute specifically requires that all the court can do is determine whether the Attorney General has presented substantial evidence in support of his certification. And second, due process requires, as a constitutional minimum, that we get notice and an opportunity to respond. Here, we were not allowed a meaningful opportunity to respond because the executive is empowered under the statute to submit secret evidence to the court with no judicial check whatsoever, and thereby prevent adversarial testing of the evidence. In fact, we were not even allowed to learn all of the provisions of Section 802, which the Attorney General invoked here. Because of these three constitutional infirmities taken singly or together, we do ask that this court reverse and remand. I think that the Article I, Section 7 argument is the one that is the most compelling here. And the question about the empowerment of the Attorney General to basically decide the law here and choose which law is applicable to my client's claims. It was unfortunate that the district court ignored this argument, and so we don't have the benefit of his analysis here. But I do think that that is the core way that Section 802 really oversteps the bounds. Don't you think you have to go to the Court of Claims? No, Your Honor. This is a case against AT&T. I understand that. But if your right's taken away, if the government has, by enacting this statute, taken away a cause of action, that's your complaint, isn't it? No, Your Honor. We think the statute's unconstitutional and can't be upheld. That's what happened in Clinton, for instance. It's a taking without just compensation, isn't it? Well, we're not making a takings claim, Your Honor. Mr. Afrin will be addressing the takings claim that they made in McMurray. We're talking about the due process requirements necessary. So a Court of Claims isn't where we would need to go for this because it's the statute itself and its lack of due process that we're challenging here. Mr. Afrin will talk about the takings argument that he made. Well, if the Court doesn't have any further questions, I would like to reserve more time for rebuttal. That's your argument? You're done? Well, I could continue. Okay. Well, I have questions. I just thought that was your introduction. It was my introduction, Your Honor. I kind of expected some questions. But I'm happy to go on with the rest of the argument. But I'm very curious about the government. I think it might be more useful to the Court for me to respond to what the government says. I'm happy to go forward. Let me ask you about two points. One, on your non-delegation argument. We would be – it's like no court in 75 years has entertained that. Is that right? That's correct, Your Honor. So all of a sudden, after 75 years and scores and scores of statutes in which they had similar situations, we would step out and say all of a sudden that this is in violation of the non-delegation clause. Well, Your Honor, I think it's due to the fact that Section 802 is very different. And, again, the district court struggled with this as well. The complete lack of an intelligible principle here is a marked difference from all the other statutes that Congress has passed. And I don't know why Congress didn't put an intelligible principle in this statute, but it plainly did not. It just says if the Attorney General certifies, then it gets dismissed. And there's no standards. You know, it's a low bar for Congress to get over, I admit. But Congress has to say something. If they're going to give this kind of – if they're going to give discretion to the Attorney General, and this statute is just bereft of it, I don't think that's – Don't they see the intelligible principle in effect by the sections that are laid out here for the Attorney General to take action on and those juxtaposed with the congressional rationale in enacting the statute? And given the low bar, isn't that enough of an intelligible principle? I don't think so, Your Honor. The five subsections give the boundaries. Just like in Clinton, you know, there were only certain kinds of congressional statutes that the line-item veto applied to. But that doesn't give you the decision about when the discretion should be exercised. It doesn't give the key decision-making authority. The statute doesn't say if any of these conditions exist, then the Attorney General should certify and the case would be dismissed. That would be a statute that I think might have closer to an intelligible principle in it. This statute just says whenever the Attorney General decides to certify, if it's in these little categories, obviously there's some boundaries about the kinds of categories, but if the Attorney General decides to certify, then the cases should be dismissed. And there's no guidance for the decision-making, the decision-making of the Attorney General. The Attorney General could decide not to certify any of these, or it could decide that it likes AT&T, so it's going to certify in the AT&T case, but it doesn't really like those Quest people, so it's not going to certify in a Quest situation or Sprint. And that's the kind of decision-that's what Congress has to give them. To certify, it tells it what it has to fit into. And within those statutes, there's some fairly specific detail about the nature of the statute and foreign intelligence or terrorism, and all of the same issues are the backdrop for the immunity statute to begin with, correct? That's correct, Your Honor, but the core thing that's missing for non-delegations purposes is an intelligible principle for when the Attorney General should certify. There are limits to the kinds of situations in which he can certify, but the fundamental decision, and the government agrees with us on this point, Your Honor, the fundamental decision about whether to certify or not is left to the executive, and we think this gives too much power to the executive. We think Congress yielded too much power to the executive in passing this statute, and the Constitution has limits to how much power the-even Congress, even a willing Congress, and in Clinton, the Court talked about this a little bit. Even a Congress willing to give its own power away is not appropriate. It's not appropriate for them to do so under our constitutional standards. But here, aren't we dealing with matters such as intelligence activity? We have an idea what that's all about, and terrorist attack, and matters such as that.  He's not going to exercise his discretion if it doesn't involve what doesn't involve intelligence activity or terrorist attack, or implicit in that is the safety of the country. Well, Your Honor, it's true that the statute says that there are only certain circumstances in which the Attorney General can certify. There are certainly circumstances where he can't. And those subsections, A through 5, well, 5 is that it didn't happen, which is really a merits decision, but 1 through 3 are particular defenses that already exist in the Fiscal Law. Number 4 is this new directive one. And the Court can find that the certification is not supported by substantial evidence. That's true, Your Honor. That's more than a mere scintilla. That gets into more the due process side of this. The Court does have a veneer of a role in this case, but it's not a full role. Normally, when you assert a defense, the Court decides de novo, was the defense met or not? There is an adjudicator who decides that. The difference, back to the point about non-delegation, and then I'm happy to talk about due process, the difference in the non-delegation situation is that just because stuff, just because what happened here falls within the five subsections of 802 does not mean that the Attorney General must certify. And, again, this is a difference between where the carrier's argument and the government's argument here. The government and plaintiffs agree that the statute just leaves it up to the Attorney General's whim or anything, we don't know, to decide whether to certify once those conditions exist. Well, the District Court didn't say that the government is left to its whim, did it? In fact, the District Court looked to the legislative history in the context of the statute. What's wrong with that? Well, the statute's not ambiguous, Your Honor. I think that with all due respect to Judge Walker, he's wrong to look to the legislative history where the statute is unambiguous. That's the Oakland Cannabis Buyers Club case and many other cases. But that's standard statutory interpretation lingo, and it's been different, for example, in the non-delegation area when we've looked at issues of foreign affairs, issues that are traditionally left to the executives. One, it's a different standard, and two, it's a different context than we have when we're just purely interpreting a statute, isn't it? Well, I think there are certainly non-delegation cases where the court took a situation in which the executive had some Article II power already in the foreign affairs situation, the military, the loving case, the military affair cases. We would argue very strongly that this is not one of these cases. My clients are ordinary Americans in their everyday domestic communications. There's no foreign affairs power here. This isn't about whether we're exporting arms to Bolivia. This isn't a military justice situation. My clients are ordinary people in their everyday communications, and this is a domestic surveillance program. They are, by definition, in the class definition, not agents of a foreign power. No, no, but everything that permits you to have the immunity relates to foreign intelligence or terrorism. It's not suggesting in this case that your clients are a terrorist organization or that they fall in those other categories, but rather the rationale for the government falls in those categories inherent in the statute. So it seems you're mixing and matching there as to where we look for this Article II or other power. Well, I don't think the president has Article II power to surveil ordinary Americans. It has Article II power around commander-in-chief powers. Certainly it has a lot of Article II power around exports. Those are the kinds of cases that you find in that. I don't think the president has independent Article II power to surveil ordinary Americans, and, in fact, I would say the U.S. v. U.S. District Court case, the Keith case, held very clearly that national security is not a basis for being free of the Wiretap Act, and I think the same should be true for ECPA. So I don't think it's appropriate to look to that case law to say that you can look beyond a statute which has no intelligible principle and find an intelligible principle somewhere else other than the statute. Congress knows how to write a statute with intelligible principle, and it didn't here, and I think it's the court's job not to rewrite the statute or to find something that Congress didn't put in it, but to interpret whether the statute's constitutional. I think Congress did not do its job here in writing a constitutional statute. If I may, I've got about a minute left. If I may, your question, Judge Pregerson, had to do with the role of the courts here, and I would like to address that. I think that the court has a small role here, but I don't think it's constitutionally sufficient. You know, the standard that Congress wrote in here was a substantial evidence standard. That's a standard of appellate review or review after a primary de novo review. It's not a standard of review for the first look at a situation, and due process requires that there be a neutral adjudicator in the first instance. That comes out of the concrete pipe case, and so I think that Congress picked a standard to try to, frankly, stack the deck in the courts in favor of the attorney general, and I don't think the due process clause allows that. I think the court deserves and the plaintiffs deserve to have a neutral adjudicator here. Nobody here says that the attorney general was a neutral adjudicator. The attorney general certainly didn't ask me for evidence on the other side before he was making his decision. He's not playing the role of the adjudicator. Everyone agrees about that. He's actually doing, though. It seems that the briefs gloss over what the attorney general is doing. If you look at the first three grounds that you could certify on, those are all FISA-type grounds related to foreign intelligence, national security, et cetera, and basically if the attorney general certifies based on those, he's basically saying that that process was already in effect through another statute, correct? He is, but he's not triggering the actual statutory defense. 802, again, kind of stacks the deck pretty dramatically procedurally. I mean, those are all defenses that could be raised in a regular case. You didn't need Section 802 for that. Those are situations where there's no notice in Sections 1, 2, and 3. In the underlying statutes, those are things that are done without any notice to the surveilled party or with the device being placed and that sort of thing. So I'm having some trouble understanding what kind of evidence one would put on in any event under that. Well, I see my time is up, but I think that the evidence you could put on is whether the scope of the surveillance is actually what was represented. You can talk about that. Obviously, we have a claim here about dragnet surveillance. We don't think that even a FISA court could authorize the dragnet surveillance of non-targeted ordinary Americans. So we could certainly put on evidence that no matter what the certification says, the surveillance that we've alleged and that we could prove is far broader than what a certification could even allow under the law. And you could put on that evidence if, let's assume the statute is constitutional and now you're back in a district court. Could you not put on that evidence? No, Your Honor, I don't think so. I think 802D limits the evidence that we could put on to merely evidence of a certification and order of classification. I mean, we tried to put all that evidence in here. I don't think Judge Walker thought he could look at it. He certainly didn't refer to it in his order. And I think if you could read 802D as providing that he couldn't look at it. The statute limits our role pretty dramatically here, again, in a way that I think violates due process. A, we don't even know what they allege. So, you know, we basically have the shadow box with the government. And B, the statute itself doesn't appear to allow the district court to look outside of the certification itself and then make a very small determination about whether there's a scintilla of evidence in support of the certification. And then he's done. And I think that's all Judge Walker thought he could do here. That's a far cry from the standards of due process that would be applicable in any other case. Does your argument assume that Article III judges would rubber stamp what the Attorney General certifies? I'm way over my time now. But I don't think it assumes it. I think that that's what Congress set up. I mean, it's not a full rubber stamp. There's the substantial evidence. But you only get to look at one side's evidence. I mean, the Attorney General gets to cherry pick the evidence. And if there's more than a scintilla, then our case is dismissed. You don't get to hear from us on legal arguments, but we have to guess. Well, I think scintilla, you're equating substantial evidence with scintilla. Well, that comes out of the, I think, the Edison case, Your Honor. That's what Judge Walker said that he thought. The other cases that illuminate on it don't really use that type of characterization. It's what Judge Walker said, so I use that. I mean, it may be slightly more than that, but it's certainly not de novo. And it certainly doesn't allow us full participation, which is what I think the Due Process Clause requires here. That doesn't mean there can't be some secrecy. The 1806 F has provisions that allow for certain things to be looked at ex parte in camera. But those provisions are in the hands of the judge. 802 puts the secrecy firmly and completely in the hands of the executive branch. And that's a very big difference between the other kinds of statutory schemes that allow ex parte in camera evidence and how 802 works. And, again, I don't think the courts are willingly a rubber stamp, but I think Congress tried to stack the deck here in a way that really removes the ability of the court to look at what's going on here and puts them in the position where they have a very minimal review and that's it. And I don't think that meets the standards for due process. I'm way over my colleague's time. You are. Now you see the hazard of splitting this up into many arguments. Good afternoon. My name is Harvey Grossman, and I'm presenting an argument on behalf of the collective cases on one issue, and that is whether Section 802 violates separation of powers and due process in completely eliminating any forms, whether in state or federal court, for the constitutional claims raised by the plaintiffs in this case. This court last faced this dilemma in American Federation of Government Employees versus Stone in 2007. In that case, it recognized the guidance provided by Webster v. Doe and examined first whether or not the statute clearly evidenced Congress's intent to eliminate all forms for the claim and, two, recognized that if it did so, it raised a serious constitutional question. In this case, there can be no doubt that all forms for the adjudication of the constitutional claims by the plaintiffs against the defendant telecons has been eliminated. And so this court is faced with that precise constitutional question. Is it different where, in fact, here the claims against the government are preserved? No, it is not, Your Honor. First of all, there, I think, are two views on that matter. The first view, and I think it's evidenced in the Bartlett v. Bowen case out of the D.C. Circuit, where I believe that the court adopted the view that once the claims are eliminated, the Constitution is violated. There are a body of scholars, and I believe that Professor Hart is one of them, who believe that you can look to see whether or not there is an alternative remedy. Here, there is no alternative remedy. The issue that the suggestion that a claim against the government is sufficient has never been found by any court to be adequate where the plaintiffs are, where the defendants are private parties. The only instances where the courts have looked at that is where there is a substitution of a government. But the only, but they're acting at the behest of the government here, correct? Well, whether they are acting at the behest of the government or collaborating with them, acting jointly. We clearly believe that they are acting jointly, but we also believe that there are two different and distinct patterns of conduct. This is not a case where all of the claims and all of the defenses are identical as they are in some of the cases where alternative remedies were looked at. For example, Verizon has asserted an affirmative right under the First Amendment to turn information over to the government. They did that in their motion to dismiss, which I believe is item number 274 in the district court docket. In that particular motion, they actually, independent of whether or not the government can request it, whether or not there is some reservation of Article II powers in the President to be able to get these materials, they assert that they have a First Amendment claim themselves under both the Free Speech Clause and under the Right to Petition Clause to turn over information to government. Now, that's an extraordinary argument, and it suggests that there's a necessity for a full and complete adjudication of both the facts and the law, and not simply the conduct of the government, who we chose not to sue, but in fact, the specific conduct of these telecoms. Because what can happen in the aftermath of the use of this alternative remedy, that is, suing the government? And I question, after listening to the first argument here today, whether that is a very viable course of action according to the government itself, that there would be these residual claims out there at any point in time, even if we were to get an adjudication against the government that their conduct was unlawful, there would still be telecoms out there with a belief that they have a First Amendment right to provide that information willy-nilly. Now, there's a number of circumstances under which that could occur, but if the government were to follow the course of conduct that it has up to this point in time, we will be totally unaware of those entreaties. We will not know when government goes to them. It will be impossible to find out. What people have done in this case is chosen not to sue the government. While five cases out of the nearly 40 cases do sue the government, over 30 cases chose not to. People specifically chose to sue the telecoms because they viewed them not as secondary players, as is suggested by both the briefs of the government and the telecoms here, and even the district court opinion, but they found them willing collaborators. They are the people who... That's when Congress stepped in. Well, Congress may have stepped in, but Congress does not have the power to remove this court's power to adjudicate constitutional claims. This is a specie of wrong that is different than all of the violations that we have depicted to date. It is the question that has been pressing the courts for over half a century, but Congress has, in its extreme loss of its constitutional profits in this case, directed that question squarely before the court. There is nowhere to go with that issue. There are no claims left in state or federal court. There are no forms. There are no administrative processes where we can get an injunction that directly binds the defendant telecoms. Thank you. Your time has expired. We have your argument well in mind. Thank you. I just want to ask him one question. Sure. What about a situation where the government had agreed to indemnify the telecommunication providers against any claims or losses asserted because of these wiretaps? I think that that would be a much more difficult question. I think that that would raise the kind of Bivens issues where a lack of an alternative form apparently is not in play because the judiciary's ability to form that kind of a damage action is limited by the constraints that Congress can impose on them. But this is not a damage claim. We have abandoned, quite frankly, the damage claim that we brought in the district court. We're seeking solely injunctive relief, and there is no precedent whatsoever for alleviating the private defendant who conspires with government, collaborates with government, acts jointly with government to massively violate the constitutional rights of individuals from the power of the judiciary to entertain the claim and to provide appropriate equitable relief. But what is the relief on a program as indicated under subsection 4, which has concluded? What is the prospective injunctive relief? Well, we don't take the position that the only issue is the terrorist screening program in subsection 4. I understand. But let's say as to that section, is there any prospective injunctive relief on that program? There is, unless the telecoms assume their obligation to show that that claim is moot. The burden is on them to show that they stopped engaging in the conduct that's described. It is not the plaintiff's burden to do that. Well, no, that's not the question. The only certification could be on subsection 4 for that period, September 11, 2001, to January 17, 2007. So as to that period, is there any prospective relief? There may be prospective relief. What would it be? If that program is, in fact, clandestinely ongoing, which we do not know, then we can enjoin it. We are not allowed to make that inquiry. They have the burden to prove that it's terminated. If they want to say that there's no likelihood of recurrence, I think the government cites Lyons for that proposition. If we're not entitled to equitable relief, we're not. I don't want to beat a dead horse, and maybe I'm not clear in my question. But if there were a program ongoing, it doesn't fall in subsection 4, does it, by definition, which has a date in it? It might have a serious problem, constitutional or otherwise, but it doesn't fall in subsection 4. If the timeframe is interpreted as limiting the actual act of surveillance, I agree with the court. But, again, we don't attack the terrorist screening program. We attack the president's surveillance program, probably. We don't know with clarity. All right, thank you. I appreciate your answer. Good afternoon. Good afternoon. I represent a group of clients who appear in the Anderson complaint, which is also McMurray 1. I'm going to be arguing three principal points. The first is that the Anderson complaint pleads causes of action against government defendants. Mr. Grossman was addressing a related issue. Judge Walker dismissed all allegations against government defendants. Those were plainly pled in the Anderson complaint. The government conceived at pages 9 to 10 of its supplemental brief on the McMurray matters that, in fact, these were pled. The government distinguishes them from Lebeau, which only raised the government as a nominal defendant. The government acknowledges Anderson pleads specifically, in substance, causes of action against government defendants. These should not have been dismissed. 802, by the government's own acknowledgement, does not extend to government defendants. Therefore, declaratory relief, and to the extent injunctive relief is available, should still go forward with respect to the government defendant claims, as Anderson has originally set forth. Anderson was never withdrawn. It was never vacated. The dismissal is only because Judge Walker said there was no amendment to include claims against government defendants. Yet they were there all along, and the government acknowledges them. And these are claims separate and apart from any takings claims. Is that correct? Yes, Your Honor. This goes to the substance of the illegality of the underlying actions. And so this is separate from the monetary claims against the private defendants. It's separate from the issue of a taking. These claims were there all along. Now, you know, there's no question that there's precedent allowing declaratory relief with respect to this type of action. Though not cited, I can provide the site. United States, the United States District Court, a 1971 decision from the Supreme Court, held that the Nixon administration had no power to engage in warrantless surveillance, even in spite of a claim of an emergency state due to terrorist attacks. The Supreme Court said, our courts under Article III are competent and frequently address issues concerning or touching upon national security. There are abilities to cabin in the inquiry, if necessary, to protect any governmental interest. But the court, by an 8-0 vote, rejected outright, with respect to President McEwen, the question you posited, whether there are some areas where intelligence questions, security questions, really take this outside of the court's scope. The court rejected that. I'll just note, Judge Justice Rehnquist did not sit on that case because he had participated in the development of the program when he was with the Justice Department. So it was an 8-0 decision. But that makes it clear declaratory relief, at the very least, is available where there is an intrusion into protected rights, whether they're constitutional or statutory, as they are under the ECCA and the SCA. So Judge Walker should not have dismissed those governmental claims. And the government makes it clear they existed all along. Just to be clear then, if we look at the Anderson complaint, and I don't know what other claims, but apart from any 8-0-2 or takings claims, then there will be general constitutional claims against the government standing on their own two feet. Yes, Your Honor. All right. And I'm quite confident of that because I wrote it. And it was designed to survive this very type of congressional intervention. So with respect to pre-9-11, it's also agreed that Section 8-0-2 does not mandate dismissal as to pre-9-11 activities. In the Bell South master complaint, which appears at page 217 of the excerpts of records, it's in Volume 2, there are two clear pleas as to pre-9-11 domestic surveillance in which Bell South is alleged to have participated. They're very clear assertions. And they were in the Bell South complaint all along. And so Judge Walker's determination that there was no amendment to include pre-9-11 allegations is with respect to the district court error. They were there all along. Which complaint are those in? This is in the Bell South master complaint, which appears at page 217 of Volume 2 of the appendix. Did you move to reconsider? We did. And we were denied. And that's really one of the basic reasons. In the motion, you pointed out that the Anderson and Bell South complaints covered these issues? I can't remember offhand, but I assume Mr. Schwartz did or at least focused the court's attention on that. In any event, they were there all along. And that's not an 8-0-2 claim? No. No, it is not. In fact, Judge Walker – Is that a claim against the government also? Or is that against the telecoms? Interestingly, Your Honor, Bell South did not incorporate claims against the government, though some of those parties came from the original Anderson complaint. So Bell South does not contain specific allegations against government defendants, only against Bell South pre-9-11. However, Anderson, which was never dismissed or vacated prior to the final judgment of dismissal, plainly is directed to a great degree against government defendants. And the government concedes this at pages 9 and 10 of their brief. So really there was no reason for us to amend the pleadings to incorporate claims that the government itself concedes were there all along. So Judge Walker, with respect, is in error. Even if there's a technical question of whether subsequent to the MDL creation, there should have been an importing of the Anderson governmental defendant claims into some formal new document. Well, that's what I was going to ask you was when everything moved to California, whether that changed the landscape to some degree in terms of the pleading landscape. Well, it really doesn't. I'm sorry? Under the MDL rules. It really doesn't because the MDL rules even speak of returning the original complaints back to their originating court once discovery is completed. And so although that's sort of honored more in the breach in reality, the rules themselves anticipate that those original complaints maintain their integrity. And no one has moved to dismiss them. What's significant on both the pre-9-11 assertions and the governmental defendant claims, there's never been a motion to dismiss. The only motion to dismiss filed is on the 802 issues. And 802 was carefully construed by Congress, at least on this one point, as a clear principle not to include dismissal as to government defendants or as to pre-9-11 activity. And so we've had no benefit to demonstrate the sufficiency of those pleadings because no one's ever made a motion challenging them. We've been dismissed through the back door, so to speak. And this is a very significant due process problem. We have clearly stated claims. There is clear precedent in our jurisprudence for declaratory relief against government entities for this type of violation. And yet we're being thrown out of court. So to paraphrase Judge Gregerson, not only has the court been told to go away, but we've been told, you know, we don't even have any right to be here, even though we specifically and clearly delineate claims against the government and pre-9-11 claims. So I would note the pre-9-11 issues are separate from the governmental defendant claims. Even if the court should conclude, well, there may not be specificity, though there is, as to pre-9-11. We say there is. And we're prepared to identify at least one named witness who will speak to those very issues. There clearly are governmental defendant claims which are viciously and nauseatingly detailed. And I was very careful to construct this to survive. And so we've been denied due process. We've been denied the very ability. Did you tell Judge Walker about this mystery witness? We identify an informant in the original Anderson complaint. We don't put his name. I understand. I would like to speak briefly to the takings question. Obviously, Judge Hawkins, that would be, in our view, a second best. Excuse me. I just want to ask you one question. So where is your case now? Anderson? Is it back to the court from whence it was transferred under MDL? No, it was dismissed by Judge Walker. Technically, dismissals should be done only in the originating court. But as I mentioned, that seems to be more honored in the breach. We are subject to a judgment of dismissal. And so we've not been given the opportunity to pursue those governmental defendant claims. Your case is here. It's here. That's your answer. Your case is here. It is here. Yes, Judge Ferguson, it is here. It's still here, but the purpose of MDL was to bring all the cases together and conduct a joint discovery and then send it back. It is. And I think that once the discovery issue, in Judge Walker's view, as to the private telecom defendants was resolved, meaning that Congress mandated dismissal and the conditions supposedly are satisfied, then the remaining claims should have been sent back to the originating court, which in this case would be the Southern District of New York. So we believe those survive, and they need to be returned. Or if Judge Walker asserts jurisdiction, perhaps we'll litigate there. It's a bit of an inconvenience. He probably won't be asserting any more jurisdiction. I assume not. What about your Tucker Act claim, though? I mean, under Bayview, how do you get forward on your takings claim? How do you get jurisdiction in the district court? Well, actually, under the Tucker Act, actions below $10,000 are cognizable in the district court. And the liquidated claim under the statute is $1,000 per violation. So if one proves no monetary harm but proves injury or proves liability, then one at least has a liquidated claim of $1,000 per violation. What's your claim for? The claim is for $1,000 multiplied by $200 million as long as it's described. How much would that be? Would that be more than $10,000? In aggregate, yes. Just to do my math? It is in aggregate more than $10,000. In fact, my math was incorrect. The New York Times corrected it when it reported the story and raised it many tens of billions. I was incorrect in my math. But even at the very least, the named plaintiffs have individual $1,000 claims in liquidated context. So even if it never went to a class action, Your Honor, there is a cognizable claim that could lead to a declaration of liability with respect to at least the actions of the telecoms and the government together under the Tucker Act but in the district court because the individual claims would be less than $10,000. We've never asserted any other monetary damage beyond the liquidated claim of $1,000 per violation. So there is a basis for that to proceed in the district court even under that context. Obviously, if it's aggregated to a class action, would that bring it above $10,000? But that's what your claim is. It's an aggregated. It's a class action allegation, correct? It is, but we're not certified. It could proceed after the individual. But the determination is based on the allegations at the outset of the case. Well, that's the way I'm looking at it, and I can't dispute that that is the $1,000 claim. I mean, you can't sort of roll the dice and see where it's going to go and then decide which court you're going to be on if there's fairly strict jurisdictional limitations under the Tucker Act. With respect, I don't think we were saying that, and though we disagree with his decision, we were happy to stay with Judge Wofford in that context and litigate there. If I could just address, I realize I'm over time, very briefly the takings, more broadly, just to say that we think that's the second best remedy. But if this court upholds Congress's intrusion into the Article III jurisdiction, then we think that it's important that this court would validate that this would represent a taking since all remedy is aggregated. And with respect to the questions from the bench, the government has not been invested with the liability to pay monetary damages, unlike virtually all of the other precedents we cite. So in that sense, there's a total of... And what's your best authority to bring a takings claim against a telecom company? We're not suggesting that. Well, there is authority that merges private actors with the government, but it puts the takings claim against the government. So your claim is solely against the government on the takings? Yes, there is a doctrine, actually, of sovereign immunity passing to the private defense vendors such that they either share the government's immunity, if it exists, or the government is responsible for their liability. And so in this context, the takings claim would have to be against the government for the actions of the telecoms. And obviously, the court of claims would have to litigate the substance of those questions. All right, we have your briefing on this point. Yes, thank you very much. I think you've been fired with your time. Thank you very much. We'll now hear from the telecom and the government defendants. May it please the court, my name is Thomas Bondi. I represent the United States. With the court's permission, I would like to use up to 30 minutes of our size, 40 minutes, and with me is Mr. Michael Kellogg, who represents the carriers, and he would then be allocated up to 10 minutes of the remaining time. All right, we'll put 30 minutes on your clock, if you would, please, Ms. Bondi. Thank you. Your Honors, as you know, this case presents the issue of the constitutionality of Section 802 of the FISA Amendments of 2008. That statute provides in specified circumstances for the dismissal of actions against telecommunications carriers and other persons alleged to have furnished assistance to an element of the U.S. intelligence community. In the decision that's before you, the district court upheld the constitutionality of the statute and on that basis dismissed these 33 consolidated cases that are involved in this proceeding. We respectfully submit, Your Honors, that the district court's decision is correct and should be affirmed. For present purposes, Your Honors, the central feature of this statute is that it makes its effect contingent upon an executive branch fact-finding, and in that regard, Your Honor, the statute is not all that unusual. In any number of circumstances, Congress has passed and passes statutes that in one way or another are dependent on an executive branch determination in order to have their consequences. In any number of circumstances, the courts, including the Supreme Court, have upheld the constitutionality of this kind of statute, including against the very type of constitutional challenges, like the non-delegation challenges that are brought in this case. The Attorney General's role under this statute is cabined and narrowly circumscribed. The certification that the Attorney General is authorized to provide is limited to certifying whether one or more of five very specific factual circumstances exist  The Attorney General, in a sense, gets to check off one or more of those five boxes and to certify to the court whether any of those factual preconditions exist. A-1 is perhaps the best example, Your Honor. Under A-1, the Attorney General gets to certify to the court whether the alleged conduct of the defendant was undertaken pursuant to a FISA court order. That's just a yes or no question that the Attorney General checks off. Alleged conduct was undertaken pursuant to a FISA court order or it was not. And I'd remind Your Honors, as you know, that whether a FISA court order exists is itself classified for reasons far beyond this statute. FISA court orders are classified. Did this Section 802 apply to pre-911 conduct in Sections 1, 2, 3, and 5? Yes, absolutely, Your Honor. A-4 is specifically limited in time. So that's the only one that limits what was known as the surveillance program? That's right, Your Honor. It specifically limits TSP, Your Honor, the terrorist surveillance program. What boxes were checked here? Are you asking me what boxes have been checked in this case, Your Honor? Yes. Obviously, that's completely classified, Your Honors. And the answer to that is available to Your Honors in the Attorney General's classified certification. But what if any boxes have been checked here and whether anyone has or has not been surveilled, whether the government does or does not have a relationship with any of the defendants, all of that is just completely classified. So the argument, though, is that this is a very unusual situation such that even though some of these are binary, yes or no, it happened, there's a directive, there's an order, whatever, because the plaintiffs can't know which of the five categories were checked or which of the multiple five categories were checked. What they really have is a unilateral litigation with no role for the plaintiff and hence the due process problem. Would you comment on that? Sure. And let me remind Your Honors, I think this is relevant, that this panel, this panel of three judges, as Your Honors will recall, decided the Al Haramain case four years ago in 2008, which is one of these MDL cases. Your Honors issued a published opinion in that case and you stated in that opinion that Your Honors all looked at the classified materials in that case, in camera, ex parte. That's what you said in your opinion. There was nothing wrong with that procedure. And not to put too fine a point on it, Your Honors, but when the three of you decided Al Haramain, you didn't violate the Constitution. You engaged in camera, ex parte review. And there was nothing wrong with that. And here, that procedure applies. The question there was not the certification, however, but the immunity. That was a state secrets privilege question. That was a state secrets privilege question and it related to an unusual circumstance where the secret document had sneaked out and come back. So it is a little bit different than this case. The facts of that case were different, but the general principle still applies. And here, Your Honor, the in camera, ex parte procedure that applies, it applies because Congress said so. In the Act, in this statute, Congress provided for an in camera, ex parte procedure. And Congress did that because it understood that these matters that we're talking about here, the contents of the certification, the underlying allegations in the cases, all of it is highly classified and the information has to be and can properly be protected. In determining, in looking at the classified information, if we look at the classified information here and if we determine that one of these five boxes had been appropriately checked based on that information, is there any role for the plaintiff in their case? Or is it game over and they have only an option against the government? I mean, it's basically game over, but if I can flesh that out a little bit. And that's their complaint, is that they can't, they say it's like shadow box litigation because they have no one to litigate this. Just exactly, by the way, just like the process that Your Honor's engaged in in the hiring, although I know that's different. That's what happened there. But Your Honor, let's make this much more concrete. Let's look at A1 where the issue is, was there or was there not a FISA court order? And let's just pretend right now in this public courtroom, in this public proceeding, you invited my opposing counsel to come to the podium and talk about that. Here's your due process. Say whatever you want. There's nothing they can say about that. What can they possibly say about whether any of the carrier defendants, AT&T or Verizon or any of the others, undertook action pursuant to a FISA court order? What could they say? The whole universe of FISA court orders is classified. There's nothing they could add to that discussion. That's the nature of the beast. What we're talking about here is things that are totally and utterly classified, and the relevant information is not available to the other side. And I'm shifting gears here a little bit. It's also not available generally to Congress. And that's one of the reasons Congress has to delegate this kind of fact-finding to the executive branch. That's true then also of subsections 2 and 3. All of it. All of it. They're all the same thing. But subsections 1, 2, and 3 are particular statutes. And subsection 4, we've had a lot more information in the public domain on that subject, correct? There's been some general information, yes, about the existence of the program. So we know the program exists. Various NSA people have made statements or had documents that have been in the public domain. But, for example, among the many things, Your Honor, that are not known about that program are who was or was not surveilled, whether any non-government persons were involved in that program. If so, which non-government persons and what they might have done. So none of the facts, none of the details are known or should be known. And those are all covered by, Your Honor, among other things, the state secrets privilege. That applies to you. But, again, the point that Congress couldn't make these fact-findings on its own, that really is an important answer to the structural constitutional claims here. That Congress has somehow improperly delegated its powers. Congress here made its legislative action dependent on executive branch fact-finding. And Congress couldn't have found those facts. Does the district court have to accept the certification? No, of course not. And can it engage in its own fact-finding to test the validity of the certification? I mean, I'm not sure what you mean by that, Your Honor. The district court obviously could hold a closed hearing with government counsel and require government to give an explanation, you know, page by page, sentence by sentence, of the classified certification. And the district court could say, I don't think you've proven the existence of this subsection. Of course. It's not just that the district court could do that. The district court's authority and responsibility is to do that. Of course the court plays a role here. This is not a rubber stamp. But the plaintiff has no role. No, but, correct, Your Honor, but the plaintiff can have no role. The matters under discussion are matters about which the plaintiff could know nothing about. They have nothing helpful to add to the conversation. And also the typical member of Congress doesn't know either. These are just not public matters. I have an odd thing. If you read the various cases on X party and in camera, they basically have a litany of saying Congress authorized this procedure and therefore it's okay. So that seems appropriate as far as it goes. But I'm not sure that those cases like the Holy Land and global relief and the others actually get under it but does that pose a constitutional question? Well, fair enough, Your Honor, but one element of that calculus would be, as I tried to indicate perhaps inarticulate, what is it that the plaintiffs could bring to the table if they were allowed to participate? And the answer is nothing. It just is. My opposing counsel, if they came to the podium right now, could not illuminate for you in any way, shape, or form whether there was a FISA court order in any way in this case. It's not their fault. They just don't know and they can't know. So when they say they want to participate, what is it that they can say? Now having said that, Your Honor, they're free if they want to submit to the district court public information that they believe supports their claims and they've done so, hundreds and hundreds of pages. Some of it is included. Maybe I misheard, but I thought they said they were precluded from introducing that. I don't think that's true, but I don't want to mislead the court. We would think that any such public information is totally and utterly irrelevant, but they're free to try to submit it. One of the counsels suggested that under 806 that wouldn't be permitted. Do you have a view on that? I don't see 802 as precluding the plaintiffs from making any kind of public material submission. I think he said 806 rather than 802. Your Honor, the section we're talking about is 802. We're talking about 802, but he said 806. I'm asking you, is there another section that somehow limits? There's definitions that precede this. I don't think so, Your Honor. Again, I want to make sure I'm articulating myself clearly. We don't see the statute as precluding the plaintiffs in a case like this from trying to make a public submission to the court, and they have done so here. But we think almost by definition and in practice, any such public materials would be totally and utterly irrelevant to the inquiry. But they're free to try. Would be totally and what? Totally and utterly irrelevant. It's just not pertinent. How can you say that? Well, for example, if plaintiffs produce to you some New York Times articles, that wouldn't have any bearing on anything here. Again, look at A1. Was there a FISA court order? That is a highly, highly classified fact, and there's nothing that the plaintiffs can bring to bear on that. And again, that's why Congress delegated the finding of this fact to the executive branch because it's not a public fact, and even Congress doesn't know. It's not intimately familiar with all of these facts and details. What if they produced information that the FISA court was a rubber stamp? I'm not even sure what that would consist of, Your Honor. I'm not sure how to answer that. Maybe I need to ask the plaintiffs this, but in order to Can I ask you one question? How many were turned down by FISA? How many requests? That's public knowledge. I'm sorry, Your Honor. I'm not sure I understand the question. What kind of requests? How many petitions were presented to FISA and how many were turned down? For FISA court authorized surveillance? Yes. My understanding is the vast majority are granted by the court. I don't know the specific numbers. The vast majority are granted. When the attorney general under the FISA asks for a court order authorizing surveillance, my understanding is that those applications, the vast majority of them are granted. I don't know the numbers. I don't know the ballgame. Because some of these sections, such as 1, 2, and 3, rely on underlying statutes. I'm not sure if the plaintiffs are actually by challenging the constitutionality of this statute in effect having to challenge also the underlying statute. But would you agree that we couldn't parse it or declare something unconstitutional here without declaring the underlying statutes unconstitutional or not? I suppose that's true. One of the features of this statute is that in significant part, in particular, as Your Honor just said, A1, A2, and A3 are really just procedures. It's a new vehicle for implementing statutory defenses and immunities that already exist in acts of Congress totally separate and apart from this statute. So that's one of the reasons, by the way, why the attorney general certification authority is discretionary and not mandatory. As my opposing counsel suggested, there may be circumstances, if it's possible, where this certification authority is not even needed in order to achieve the statute's purposes. And in part because there are underlying statutes. And there may be cases in which some of this, for whatever reason, is not secret the way it is here. Suppose in a district court ex parte hearing to test the certification, a district court judge determined that some of the plaintiffs in a suit like this were not surveilled at all. What does the judge do? Whether they were not surveilled at all? I mean, that might be relevant to an A5 certification. But just to be clear, things like who was or who was not surveilled, I want to make clear the court understands, that's classified. The one thing the judge couldn't do is reveal that fact. I think that fact might be relevant to whether the A5 box could be checked off. But revealing who was surveilled, who was not surveilled, which carriers, if any, were involved with any aspect, that's all classified. What any particular carrier did or did not do, that's all classified. And by classified, I don't just mean classified. I mean also, in our view, you know, it was protected by the state's issues for that. So that's just the universe that covers this case. And that explains why Congress did what it did here. And we think under settled principles, the act is plainly constitutional. Well, one of the concerns the plaintiffs have is that there's no real dividing line or standards to say whether or not the immunity is invoked. So there's a certain willy-nilly aspect to it. Apparently, it's been invoked here. You've said that. That's the only public thing we know. There's been some invocation, and there's been some documents submitted that are classified documents. Why isn't it procedurally defective if there's no intelligible principle or at least no guiding principle as to when the attorney general would say immunity or no immunity, and he's not just shuffling the cards? I think there are intelligible principles, and I'll get to them right away. But let me point out, Your Honors, that it would be extraordinary, it would be very odd for Congress to pass a statute like this that confers on the attorney general a potent tool. This is a potent tool when the attorney general uses it. It can result in the dismissal of court cases. It would be very odd for Congress to grant the attorney general this authority, to give the attorney general this big stick, if you will, and then say, you must use it. You are compelled to use it. It is mandatory that you use this power. That's generally not how Congress confers authority on the attorney general or the head of the CIA or the head of the FBI or the executive branch in general. The discretion here makes perfect sense. And again, there may be circumstances in which there is no need for the attorney general to invoke this procedure because its purposes are served otherwise. Well, why did Congress confer such authority? There had to be a reason. We know there are two reasons, Your Honor, at least two reasons. They're interrelated and they were articulated very clearly in the legislative history, and they provide a sufficient intelligible principle. Number one, Congress was concerned that the prospect of litigation itself and the prospect of litigation liability could improperly deter in the future private persons from lawfully cooperating with the United States intelligence community in a way that would result in harm to national security. That's number one. And number two, Congress was concerned that the litigation itself, just the existence of litigation, poses a risk of disclosure of sensitive national security information. Those were the two animating purposes of the statute. We know that. Congress said it over and over again in the legislative history. Those principles, combined with the fact that the attorney general certification authority is limited to just checking off these five very specific boxes, A1 through A5, if you put all of that together, that's more than sufficient to satisfy any non-delegation concern in this case. Well, was it because of the entreaties that were made to the communications company to help out? No, it's important to us, national security, that you give us a hand on this. And then all these lawsuits were filed and they posed a serious risk of a heavy financial burden that Congress and the executive felt that maybe they'd put these telecommunication companies at some risk, and this was a way of ameliorating that situation. In a general sense, yes, Your Honor, but if I can remind the Court, the statute applies to pending cases, which is these cases. It also applies more generally to future cases. This statute has a retroactive application, but it applies in the future, too, to other cases. Yeah, yeah. Are there any lucky plaintiffs who have fallen outside this statute? This statute covers all the cases against the carriers. There are 33 here before you. These are the MDL cases against the carriers, and they're all here, and we think they all were properly dismissed. And again, if I can reiterate, this statute requires dismissal here in its operation of the claims against the carriers, but this statute, of course, leaves entirely unaffected any claims that were out there or are out there against the government. So whatever plaintiffs may or may not be able to get vis-a-vis the government or vis-a-vis government employees under a Bivens theory, that remains unaffected by this statute. That's just the whole other universe. The government then has waived any sovereign immunity as far as those claims being asserted against it. Your Honor, let me be absolutely clear. As to the government claims, we think all of those claims have to be dismissed for any host of other reasons. State secrets privilege, some claims for money would be barred by sovereign immunity. There could be Article III standing issues, but those are arguments that we make in the other cases, and those will be accepted ultimately by this Court if they're right. The only point here is that this statute applies to the carriers and the carriers only and leaves all the government cases entirely unaffected. Your Honor, may I respond briefly to something one of my opposing counsels said about the pre-9-11 allegations? I'd like to clear that up. There are 33 cases here. This includes Anderson and Bell South? That's exactly what it includes, yes, Your Honor, and nothing else. As I understand it, I think my arithmetic is right, that's four of the 33 cases, but I might be wrong. Anderson, also confusingly called McMurray One, hard to keep track of these cases. And the Bell South cases, and I think there are three of those, and I'm sorry if some of those numbers are wrong, it doesn't really matter. Some of those complaints contain allegations that refer to claimed pre-9-11 activity by the carriers. That's obvious. It's right in there. The District Court understood that. What the District Court said in issuing a dismissal order here is that if any of these plaintiffs still wish to pursue pre-9-1 allegations, they should file an amended complaint that meets applicable pleading standards. The existing complaints don't meet sufficiently the applicable pleading standards. And they didn't do that? No, they elected to stand on their complaints, and now they have to live with that result. The judge told them, amend your complaint to meet pleading standards if you wish to pursue the pre-9-11 claims. And let me make clear, the pre-9-11 conduct that is referred to in the complaint is things like, and it really is a particular carrier, Bell South, began development in February 2001. It's things like that. It doesn't mean anyone was actually doing anything pre-September 2001. And the judge understood that and said, you need to make those allegations of pre-9-11 activity more specific, file an amended complaint if you wish to pursue them. And the plaintiffs here expressly elected not to do that, and they're now stuck with the consequences. And in any event, none of that matters, because the Attorney General's certification here expressly covers all of the allegations in all of the complaints. And that includes the pre-9-11 allegations. The Attorney General's certification covers everything. It says so in the public certification, and obviously all of that is elaborated in the classified certification. So to the extent this Court views these cases in part as raising pre-September 11, 2001 allegations, fine, those are covered by the AG certification just like everything else is covered. What about McMurray 1, claims against the government that are for declaratory relief and that wouldn't fall under 802? 802 does not and should not result in the dismissal of any claims against the government. And to the extent in that case claims against the government were dismissed, that's wrong. That's a mistake. But I feel someone here has to defend Judge Walker, so let me just do it very briefly. We don't have to defend. There are so many cases and claims here. We're just trying to make sure we get the correct posture for each of these cases. So to the extent that there are claims against the government, obviously 802 doesn't affect those. And to the extent that they were accidentally swept in, that would be an error. Correct. And we've never argued otherwise. That just affects one of these 33 cases and only in part. Your Honors, unless the Court has any further questions, I have nothing more, and I would pass the baton to Mr. Keller. Thank you. Thank you. All right. Don't drop it. Thank you, Your Honor. Michael Kellogg on behalf of the carriers. As Mr. Bondi explained, Congress may have considered judgment that it would be both unfair and potentially harmful to the national security if carriers who were alleged to have assisted the government in alleged surveillance were subject to lengthy suits and potential ruinous liability. There is no question and no dispute that Congress could have acted directly to foreclose these suits, as they did in Seattle-Audubon, which the Supreme Court approved, or as they did in the Alito v. Glock case before this Court. But Congress instead wanted to impose two safeguards. They wanted the Attorney General personally to certify that one of the circumstances set forth in the statute was satisfied before immunity was given, and they wanted an Article III Court to look at that certification and determine that there was substantial evidence supporting it. But Congress also understood that deference to the executive in this area of national security was important, and that the parties would not be able to see confidential information. But both of those procedural safeguards that they put in place are totally unexceptionable and have repeatedly been approved by courts. For example, in the Beatty case, Beatty v. Republic of Iraq, the President acted to foreclose suits against the Republic of Iraq, private suits, by certifying or declaring that they were no longer a state sponsor of terrorism. Suits were just eliminated. No process whatsoever. In the atmospheric testing case before this Court, the exact same thing happened. The government came in and certified that the contractors were working on behalf of the government, and therefore the government was substituted as a defendant and the private parties were removed. Having a substantial evidence standard actually provides more process than was permitted in those cases. But deferential review of executive judgments is standard in the national security context, whether it's terrorist designations, whether it's FOIA requests, whether it's foreign sovereign immunity designations, or whether it's a state secrets assertion. Do we invoke Matthews to benchmark the due process here? Well, Matthews is a balancing test. It depends on the strength of the property or liberty interest and the strength of the government's interest. Here, the plaintiff's interest in an incoherent cause of action is at best marginal. By contrast, the government's interest in preserving national security and preventing terrorist attacks and protecting sources and methods of intelligence is at its height. Moreover, the procedures established are designed not to result in erroneous determinations here because the five factors under 802 are really very straightforward. And the district court is going to review the attorney general's confidential certification and can readily determine that the circumstances are present here. So additional procedures would both compromise national security and would not lead to any more likely correct result. And, as noted, the plaintiff's property interest in the incoherent cause of action is so limited that in Seattle Audubon and Aledo v. Glock, the court said you could simply wipe it out by statute. The same thing is for the ex parte review, which this court in Casabie-Browner said is unexceptional, which this court followed in the Al-Haraman case and in the Islamic Shura Council case, where it said, you know, we can't have counsel looking at these national security documents. So the judicial revolt. The case that the appellants rely on most heavily is the immigration case out of the Ninth Circuit. That's correct. American Arab case. They do rely on that. I would point out that in that case what the court said was that the statute did not allow the use of secret evidence. They interpreted the statute to not allow the use of evidence in that case. Here, of course, the statute is absolutely clear that upon the attorney general's certification, the disclosure of the information would compromise national security. It's to be kept secret. It can't be an answer that Congress simply said an ex parte procedure is enough. That can't be enough to pass constitutionality. Otherwise, the Congress could say, well, I think we should have ex parte procedures in the federal courts. That's true. I was simply distinguishing the AAPC. You would agree that would be unconstitutional if that were a blanket. If they said what? No more hearings. Everything can be ex parte in the federal court. I admit that would be a problematic statute. But that's not what we have here. So, in other words, it has to be something more than the fact that Congress just puts it in a statute. What more do you need to make it constitutional? Well, that's what I was explaining with the Matthews v. Eldridge balancing test to determine what procedures are required. And Congress was dealing with a sui generis situation, so they passed a sui generis statute. But every element of this statute, including this deferential review and the ex parte review, have numerous precedents, both in the Supreme Court and in this court. It's unexceptionable, as this court said, in Cassidy-Browner, for courts to look at confidential materials in private. And as I said, under a Matthews v. Eldridge balancing test, the risk of erroneous deprivation is very limited here, given the specific circumstances specified in the statute. This is a point that this panel made very clear in its Al Harriman decision, when he said, look, because we have in-camera review, the court has a special obligation to look at this closely. But at the same time, and I quote here, we acknowledge the need to defer to the executive on matters of foreign policy and national security, and surely cannot legitimately find ourselves second-guessing the executive in this arena. And this is a point that actually relates to the Article I arguments that Ms. Cohen was raising, because this is a core executive function in the national security area, to determine whether certain facts exist that require invocation of the national security. Now, we can't go back 75 years to Shrek-Poulsen. And even that case was in a legislative context, where Congress delegated legislative power. Here we're talking about a core executive function to determine whether certain facts exist, whether immunity should be asserted, whether the government should stand in place of the potential alleged private assisters. You're talking about the sick chicken case, huh? I am. Yeah, I remember when that came down. That was a hue and a cry and a cackle. Exactly, and I don't think we're going back there. I don't think any of the courts are going back there. Well, we went forward from that to a kinder, gentler court. Well, to a court that was less interested in overturning acts of Congress that established procedures that were perfectly appropriate under the Constitution, as we have here. And all the executive does in this instance is execute the law as determined by Congress. Congress changed the law in 802 and created a new defense. It's Congress that changed the law, not the Attorney General. The Attorney General only decides whether to invoke that particular defense and make the certification. Again, Republic of Iraq debate absolutely disposes of plaintiff's Article I argument. Because in that case, the President had authority to essentially knock Iraq out of the suit by saying that they could invoke immunity under the Foreign Sovereign Immunities Act. Because originally they'd been designated as a state sponsor of terrorism. Congress gave the President the authority to override that designation. He did so. As a consequence, the suits were dismissed. And the Supreme Court found that perfectly acceptable under Article I. Not an improper delegation of power, not a problem under the presentment and bicameralism. The only other point I would like to make is to correct something Mr. Saffron said about the takings claim. He suggested that under the Little Tucker Act, they had a $1,000 claim. And therefore, I'd like to read you from page 30 of their brief in this court in which he says, quote, the instant case demands no monetary damages from any party, including the United States. He did not make a Little Tucker Act claim below. Instead, he made a claim seeking injunctive relief, which under this court's decision in Bayview, he cannot do unless a Tucker Act claim is foreclosed. And there's no indication here that such claim is foreclosed. The final point I'd like to make, actually, Ms. Cohen, I think you mischaracterized the substantial evidence standard as quoted by Judge Walker and applied below. It does say it's more than a scintilla. It says that substantial evidence is the sort of evidence that a reasonable person could rely upon in making a decision of importance, which is exactly what we have here. And that sort of deference to the determination of the attorney general in a context involving the sources and methods of intelligence is totally unproblematic under many cases of the Supreme Court. Does the court have any further questions? No. Thank you. All right, Your Honor, I will try to reserve two minutes for Mr. Afrin and hopefully won't use all of that. I wanted to start first with what Mr. Bondi said, I think, repeatedly, which was what could we possibly say in response to their certification? And I would like to say that we would actually have quite a lot to say in response to their certification. And I want to look specifically at A4 and A5. Those are two provisions that have actually quite a bit of statutory language about what the attorney can do and when he can do it. First of all, under A4, the program must have been designed to prevent a terrorist attack. We certainly would have a lot to say about whether the untargeted dragnet surveillance of all of the telecommunications customers of AT&T met the standards of design to prevent a terrorist attack under A4. But under 802, we have no role. And I want to be very clear, I think Your Honor might have misheard me. It's section 802D is the section that limits the role of the parties here to merely presenting a certification here. Under A5, which is the one where the Attorney General has denied that they are engaging in the content surveillance, the denial is very carefully couched if you read the public certification. They said that they're not doing a content dragnet in order to perform keyword searches of people's communications. But we didn't allege that the only thing they were doing with the content dragnet was for the purpose of analyzing the communications through keyword searches. So the denial is very artfully crafted. We certainly would like the opportunity to discuss the evidence, and frankly unrebutted evidence we have, of something much broader going on and with much broader capabilities than simply doing keyword searches. But the way that section 802 is structured, we don't get to do that. And I would point the Court to the excerpt of our complaint in experts of record section 55, 56, 131, 132, 176, 177, 217, 218. Why would it matter under section 4? Because under section A4, they only are able to have the written directive. The substantial evidence must demonstrate that they were given a written directive and that the surveillance was designed to prevent a terrorist attack. We would like the opportunity to demonstrate that the surveillance that actually occurred could not meet the standards of designed to present a terrorist attack. And so the Attorney General would not have met his burden here. If this were a de novo review, we would put in our evidence of what we thought happened. They would put in their evidence about what they thought happened, and the Court would review themselves. But because of the way section 802 is structured, the Court only looks at what the Attorney General says. We are completely limited, and the Court doesn't get to make a de novo determination. So it's slanted in a way that I think is far outside the bounds of reasonable due process. How is this different than the certification in atmospheric testing? Well, atmospheric testing was a full immunity, and that was created by Congress. The Attorney General didn't have discretion in atmospheric testing not to give the certification if it happened. That's the difference, and that's the key difference that we're talking about here. The Attorney General here can find that AT&T did get a written directive and decide for whatever reason not to issue a certification. The fundamental decision about whether to certify or not in this case was given to the Attorney General. It wasn't given to the Attorney General in atmospheric testing. They had to certify if it happened. So that's the problem. I think that's the Article I, Section 7 problem in a nutshell. Let me ask you about the hearing because there's the specific language of D which says any party, and then it says you can put in relevant 802 certification, written request, or directive, which I take it in your view is a narrow scope and wouldn't include all this background data that you may have actually that's not classified that you would like to put in. That's correct, Your Honor. But then I also heard the government say, come on down. They wouldn't have any objection to that kind of information, and in their view they think that you can put it in and then the court can do what they want with it. Well, I don't think that the government gets to rewrite the statute either. No, I understand that. I'm just asking if you have the opportunity to be able to submit evidence that is not classified and that wouldn't intrude on the government classification, would that in part alleviate your due process? It would certainly alleviate them somewhat. I don't think it gets rid of them entirely unless we've got a fact finder who can consider them de novo as opposed to just looking at whether the attorney general has presented substantial evidence or not. I think you don't get out of the kind of slanted. Our ability to put in evidence doesn't change the kind of fundamentally slanted nature of what the court's standard of decision. But it would certainly help a bit. I don't think it would take it all the way to constitutional. And I think under A5 there are a couple of very troubling legal arguments, one that again we'd like to be able to excavate. One of them was made by Verizon Below. Verizon argued below that it doesn't count as an interception or a violation of anybody's rights if the government gets copies of everybody's email and phone calls, but only a computer looks at them and a human doesn't. Well, that's an extremely interesting argument. I think it's wrong as a matter of law. An interception is acquisition by a device. That's actually the statutory definition. But if the government's denial that they're doing it is based upon this legal analysis, we have no way of knowing. We can't argue it. We don't have a position to maybe make this incredibly important, I think, legal argument. Does a computer listening to your communications count or not? We're denied access to make that kind of argument. We also don't know. The other argument that we've heard sometimes is that the government gets copies of everything, but then they only look at the header information, the to and the from and the subject lines, and they don't actually look at the content. So that shouldn't count for purposes of a content dragnet. That's another very interesting question that I would like to litigate desperately. But that is what the government's doing. It is not the assistance provided by the carrier. In other words, whether the government then does a keyword search or analyzes it or sends it through the computer is unrelated to whether the assistance got there in the first place that permitted the government to do that, isn't it? So it seems to me that you're turning things inside out and mixing and matching the claims that you have. I don't think so, Your Honor. If I may, it goes to whether they've issued a denial of the content dragnet. And what I want to know is, okay, what's behind that denial? Is that denial based upon this legal analysis? In which case, I want to be able to challenge that denial. It's not a denial at all for purposes of what is it that they're denying. So for purposes of A-5. You say they issued a content dragnet denial. In what context? Here, the public certification of Attorney General Mukasey says it doesn't say for the record of claims what subsection. Right. But for the content claims that we've made, he says A-5. It didn't happen. And the problem with subsection 802 that exists, that wouldn't exist if this was a regular litigation, is I could say, what's underneath that denial? Is the denial based on a legal argument, a legal position that you're taking, that it doesn't count as an interception if a computer just looks at it? So therefore, you can deny that there's been an interception. Is the denial based upon your argument that as long as you throw away the content and you only look at the metadata, that that doesn't count as a thing? Is that the basis of your denial under A-5? I would get to litigate that, and the judge could decide. And the judge could say, I don't think the government's legal argument, that that doesn't count as an interception, holds water. So therefore, I don't find that this denial is a substantial denial. So there are really important legal questions underlying, we think, especially the denial here, that we'd like to get to. But 802 prevents us from getting to. I'm just trying to understand your argument, because under Section 5, assistance, which has to come from the telecom and doesn't relate to the government, is defined as if the telecom is providing access to information, facilities, or another form of assistance. So how does that fit into your argument? Just explain that to me. I'm not quite sure I'm understanding the government rule versus the telecom rule. I think, and Verizon made this argument below in the district court, that it doesn't count as assistance if it wasn't itself an interception. So unless the assistance creates the legal interception, it doesn't qualify as assistance either, and so it doesn't count for purposes of the statute, whether they provided assistance or not. So that's Verizon's argument below about the computer searches. We've heard similar arguments about metadata. Were you permitted to counter that on a legal basis? I mean, make your legal argument. We were not. I mean, we put a couple paragraphs in, but, again, the statute really doesn't provide for the court to look at anything other than the attorney, whether there's substantial evidence in support of the attorney general's certification. I'd like to clarify a couple of other things quickly. First, one of the questions that you asked. Your time has expired. I'm sorry. Thank you. Thank you. We had reserved two minutes for you. Thank you. Very briefly, Paragraph 68 and 69 of the BellSouth Master Complaints state specifically that since February 1, 2001, BellSouth has been divulging call history and individualized customer information to the NSA. That's clear and unambiguous. The Anderson complaint specifically asserts that beginning February 1, 2001, the NSA and AT&T conspired to construct a listening center to be operated by the NSA that would give the NSA complete access to all telephone information that went over the AT&T network. Nothing is ambiguous about those assertions. They're clear, they're discreet, and they exist. And so under Congress's conception of the statute, these should go forward. In addition, I would note that in cases such as Glock, novel common law damage claims were being raised. In cases such as Bayview, the designation of a state as a terrorist entity was always something that was within the exclusive factual finding of the president. But no precedent allows Congress to give the Attorney General authority to declare lawful today what was unlawful the week before and what had been unlawful for at least 15 years under the ECPA and the NCA. And that's the fundamental distinction between this situation and the cases relied on by the defendants. These are settled rights that the telephone consumer has had expectation that would exist and protect him or her. The ECPA and the NCA's provisions were imposed by Congress in response to Smith v. Maryland, in which the Supreme Court said there is no Fourth Amendment right to protection of phone records because they are inherently given to a third party, the telephone communicator, the telecommunication carrier. So Congress interposes this protection by statute because the court said it doesn't exist constitutionally under the Fourth Amendment. And this was a settled expectation underpinning all telephone consumer contracts since the inception of these provisions. And it was intended by Congress to give that consumer protection where the Supreme Court said it would not exist under the Fourth Amendment. So we have, in contrast to all of the decisions relied on by the defendants, a clear settled legal right that Congress specifically intended to protect the consumer because the Supreme Court said the Constitution would not. And so this is highly distinguishable. We're having a game of shuffle in which Congress allows the consumer to believe for decades that he or she has a right and protection. And then when it's disclosed that that right is violated, Congress changes where the bean is under the shell and says you lose. Game over. Thank you. Thank you. The cases just argued, McMurray v. Verizon Communications and Hefting v. AT&T Corporation in the USA, are submitted. The Court wants to thank all counsel for your arguments this afternoon and also particularly for the briefing on all sides, which is very extensive and very helpful. Thank you. With that, we're adjourned.
judges: Pregerson, Hawkins, McKeown